**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| CFM DISASTER RECOVERY SERVICES, LLC; FCA CONSTRUCTION, LLC; FCA ELECTRICAL SERVICES, LLC; FCA EQUIPMENT, LLC; FCA MECHANICAL, LLC; FCA PLUMBING, LLC; FCA ROOFING, LLC; and ALBERT WALTER COURCELLE, III, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| | ) No. 2:23-cv-06139-DCN |
| vs. | ) ) **ORDER** |
| SOUTHSTAR FINANCIAL LLC, | ) ) |
| Defendant. | ) ) |
| SOUTHSTAR FINANCIAL LLC, | ) ) |
| Counter-Claimant, | ) ) |
| vs. | ) ) |
| CFM DISASTER RECOVERY SERVICES, LLC; FCA CONSTRUCTION, LLC; FCA ELECTRICAL SERVICES, LLC; FCA EQUIPMENT, LLC; FCA MECHANICAL, LLC; FCA PLUMBING, LLC; FCA ROOFING, LLC; and ALBERT WALTER COURCELLE, III, | ) ) ) ) ) ) ) ) ) |
| Counter-Defendants. | ) ) |

This matter is before the court on plaintiffs'[1] motion for a temporary restraining

order and preliminary injunctive relief ("TRO motion"), ECF No. 31, and on defendant

---

[1] Throughout this order, the court will refer to plaintiff CFM Disaster Recovery Services, LLC ("CFM"); plaintiff FCA Construction, LLC ("FCA Construction"); plaintiff FCA Electrical Services, LLC ("FCA Electrical"); plaintiff FCA Equipment, LLC ("FCA Equipment"); plaintiff FCA Mechanical, LLC ("FCA Mechanical"); plaintiff

SouthStar Financial, LLC's ("SouthStar") motion to dismiss for failure to state a claim, ECF No. 33.  During a hearing on the two pending motions, the parties agreed that the court would need to rule on the TRO motion if it declined to dismiss even one of plaintiffs' causes of action.  ECF No. 51.  Given the exigencies of plaintiffs' financial situation, the court issues this order on the TRO motion and will rule on the motion to dismiss in a separate, forthcoming order.  For the reasons set forth below, the court denies the TRO motion, ECF No. 31.

## I.  BACKGROUND

### A.  Factual Background

At base, this case presents a dispute between a financing company and a group of commonly owned construction companies over allegations that the financing company deceitfully took control of the construction companies' business operations.  See generally ECF No. 6, Amend. Compl.

Courcelle is a member and/or manager of the FCA Companies.  Id. ¶¶ 3–9, 18; ECF No. 31-2 ¶ 2.[2]  The FCA Companies were originally founded to do disaster-recovery construction work but have recently expanded into other construction fields.  ECF No. 31-2 ¶ 3.  They are primarily located in southeastern Louisiana.[3]  Id.  The FCA

---

FCA Plumbing, LLC ("FCA Plumbing"); plaintiff FCA Roofing, LLC ("FCA Roofing") (collectively, the "FCA Companies") and plaintiff Albert Walter Courcelle, III ("Courcelle") collectively as "plaintiffs."

[2] The amended complaint indicates that the sole member of FCA Roofing is FCA Construction.  Id. ¶ 9.  Courcelle is the sole member of FCA Construction and a member of all of the other FCA Companies.  Id. ¶¶ 3–9.  Courcelle also identified himself as the member and manager of all the FCA Companies in the declaration he filed with this court.  ECF No. 31-2 ¶ 2.

[3] Specifically, the amended complaint states that all of the FCA Companies except FCA Electrical and FCA Mechanical are limited liability companies organized according to the laws of the state of Louisiana with their principal places of business in

2

Companies often face cash-flow problems that are not uncommon in the construction-related industry.  Id. ¶ 4. The COVID-19 pandemic and ensuing high inflation rates over the past few years exacerbated these problems, and plaintiffs sought various financing options as a result.  Id. ¶¶ 4–5.

### 1.  The Agreements Between Plaintiffs and SouthStar

In late 2022, the FCA Companies decided to meet their financing needs by factoring some of their accounts.  ECF No. 31-2 ¶¶ 5–6.  Courcelle describes factoring as "a process by which one or more of the FCA Companies 'sells' its accounts receivable to a factoring company for a cash infusion that represents a discount from the face value of the accounts receivable."  Id. ¶ 5.

Initially, plaintiffs considered developing their new factoring relationship with the Baton Rouge, Louisiana-based, Evergreen Working Capital, LLC ("Evergreen").  Id. ¶¶ 6–7.  However, Courcelle testified that plaintiffs chose, instead, to go into business with SouthStar based on representations made by SouthStar's then-regional Vice President Todd Culbreth ("Culbreth").  ECF Nos. 31-2 ¶ 7; 51.  Specifically, Courcelle claims that Culbreth told him that SouthStar would not require control over the FCA Companies' funds and would be "hands off," meaning SouthStar would not contact the FCA Companies' customers or construction project owners directly.  ECF Nos. 31-2 ¶ 7;

---

Jefferson Parish, Louisiana.  Amend. Compl. ¶¶ 11–17.  FCA Electrical is organized according to the laws of the state of Texas and has its principal place of business in Jefferson County, Texas, but its principal office is located in Jefferson Parish, Louisiana.  Id. ¶ 13.  FCA Mechanical is organized under the laws of the state of Texas and has its principal place of business in Harris County, Texas, but its principal office is also located in Jefferson Parish, Louisiana.  Id. ¶ 15.

51. During the hearing, both Culbreth and Courcelle testified about their conversations, but they disagreed on the extent of Culbreth's representations. See ECF No. 51.

On December 12, 2022, Courcelle, on behalf of the FCA Companies, executed three agreements with SouthStar: (1) the Non-Recourse Factoring and Security Agreement (the "Factoring Agreement"), (2) the Construction Advance Addendum to Factoring and Security Agreement (the "Construction Addendum"), and (3) the Non-Recourse Factoring and Security Agreement Attestation (the "Attestation") (collectively the "Agreements"). See generally ECF No. 31-5. The Factoring Agreement outlined how the FCA Companies were to sell their rights to payments on certain accounts to SouthStar and how SouthStar was to assess fees on those accounts. See id. ¶¶ 1–4.

Essentially, the Agreements provided that SouthStar could purchase certain accounts from the FCA Companies. Id. ¶¶ 1–2. The FCA Companies' "Account Debtors"—those obligated to pay the FCA Companies—were to make their payments directly to SouthStar. Id. ¶¶ 1–6. Under normal circumstances, after those payments were made, SouthStar was to deduct the purchase price and its fees from the payments and return the rest to the FCA Companies. Id. ¶ 4. However, under certain specifically enumerated circumstances, SouthStar would also have the right to divert a portion of the payments into a reserve account rather than returning that money to the FCA Companies. Id. ¶¶ 4–5. In particular, SouthStar could direct money to a reserve account if, among other reasons, SouthStar believed in good faith that any of the following scenarios had occurred: (1) "the [FCA Companies'] financial position ha[d] deteriorated," (2) there was an increased risk that the FCA Companies would default on the Agreements, (3) the FCA Companies had actually defaulted on the Agreements, or (4) "a legal or indemnity risk

4

exist[ed] related to the [Agreements] that may require [SouthStar] to fund legal expenses and costs." Id. ¶ 5.

The Factoring Agreement also included additional provisions describing what was to happen in the event the FCA Companies defaulted on their obligations. To secure the debt, the Factoring Agreement granted SouthStar a security interest in collateral owned by the FCA Companies. See id. ¶ 8. Collateral was defined as "all of [the FCA Companies'] presently-owned and hereafter-acquired personal and fixture property, wherever located, including, without limitation, all Accounts . . . all proceeds and products of the foregoing . . . and proceeds of the Accounts of the Account Debtor." Id. The Construction Addendum further specified that the FCA Companies assigned SouthStar "all of [the FCA Companies'] rights under each and all of its construction agreements . . . now existing and hereafter arising, with contractors and owners . . . as Collateral for any and all now existing and in the future amounts due from" the FCA Companies to SouthStar. ECF No. 9-3 ¶ 3. If the FCA Companies defaulted, SouthStar would have the right "in its sole discretion" to terminate the Factoring Agreement, take efforts to recover the collateral, and retain a reserve account as described above. ECF No. 31-5 ¶ 10(b).

Both sides now accuse each other of violating the Agreements soon after their execution. SouthStar sent plaintiffs two "Notice of Breach" letters within a few months of the commencement of the parties' contractual relationship. ECF No. 51.[4] In the notice sent April 20, 2023 (the "First Notice of Breach"), SouthStar accused the FCA

---

[4] Both of these notices of breach were entered into evidence during a hearing on the two pending motions. ECF No. 51.

Companies of entering into a Merchant Cash Advance Agreement ("MCA") with Parkside Funding Group, LLC ("Parkside"), whereby the FCA Companies granted Parkside a security interest in their accounts receivable for $1,038,500.00.  Id.; see also ECF No. 21-3 ¶¶ 7–9 (Wolff Decl.) & at 6–25 (Parkside Agreement).  SouthStar also contended that the FCA Companies took on other debts owed to a company called LevelSet.  ECF No. 51.  On the whole, SouthStar said the FCA Companies breached the Factoring Agreement by taking on the debt owed to both Parkside and LevelSet.  Id. Likewise, in the notice sent May 11, 2023 (the "Second Notice of Breach"), SouthStar accused the FCA Companies of failing to pay some their subcontractors and suppliers, which SouthStar also said was a violation of the Factoring Agreement.  Id.

Conversely, Courcelle testified that he believed the defaults mentioned in the First Notice of Breach and Second Notice of Breach were cured.  ECF No. 51.  Moreover, plaintiffs accuse SouthStar of improperly using the purported defaults mentioned in the First Notice of Breach and Second Notice of Breach to exert control over plaintiffs' finances under the guise of recovering collateral.  Amend. Compl. ¶¶ 77–84.  Courcelle also claimed that SouthStar sent several "Notices of Assignment" ("NOAs") and estoppel letters to several of the FCA Companies' customers whose accounts SouthStar did not factor.  ECF Nos. 31-2 ¶ 10; 51.  He stated that some of his customers did not want their accounts factored, so SouthStar's contact harmed both the FCA Companies' reputation and their ability to do business with some of these customers.  ECF Nos. 31-2 ¶¶ 9–10; 51.  Courcelle believes that, by contacting these customers in this manner, SouthStar violated not only the terms of the Agreements but also Culbreth's pre-contractual representations.  ECF Nos. 31-2 ¶¶ 9–10; 51.

6

### 2.    Initiation of this Lawsuit and Subsequent Further Disputes

Plaintiffs initially filed this lawsuit against SouthStar in the United States District Court for the Eastern District of Louisiana on August 29, 2023.  ECF No. 1.  They then filed an amended complaint two days later to cure deficient pleadings related to the court's jurisdiction.  See Amend. Compl.; ECF No. 5 (order directing plaintiffs to amend their complaint).

Plaintiffs' allegations in their now-operative amended complaint can be divided into two categories.  First, they allege that SouthStar improperly contacted their customers in violation of both Culbreth's pre-contract representations and various provisions of the Agreements.  See Amend Compl. ¶¶ 131–39, 156–72.  Thus, plaintiffs say that Culbreth's representations amounted to a misrepresentation of SouthStar's true intentions and that plaintiffs therefore entered into the Factoring Agreement based on fraud or error.  See id.  Second, plaintiffs say that SouthStar has used various provisions in the Agreements to exert an extreme level of control over plaintiffs' finances and impede their ability to do business.  See id. ¶¶ 122–30, 140–55.  Plaintiffs assert seven causes of action: (1) violation of the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Stat. Ann. § 51:1401, et seq.; (2) misrepresentation; (3) breach of fiduciary duty; (4) abuse of rights; (5) lender liability; (6) rescission; and (7) declaratory relief.  See id. ¶¶ 122–72.

On August 31, 2023, two days after plaintiffs filed this lawsuit, SouthStar sent plaintiffs another "Notice of Breach" (the "Third Notice of Breach").  ECF No. 31-4.  In the Third Notice of Breach, SouthStar accused plaintiffs of improperly accepting payment for work plaintiffs performed for St. John the Baptist Parish.  Id. at 1.  SouthStar

stated that, under the Factoring Agreement, plaintiffs were required to deliver that payment to SouthStar and that plaintiffs' failure to do so amounted to theft of SouthStar's property.  Id.  SouthStar also cited its First Notice of Breach and Second Notice of Breach and stated that "[d]ue to the severity of these defaults, this is SouthStar's final notice of breach and notice that SouthStar has no intention of continuing to fund under [the] Factoring . . . Agreement."  Id. at 2.  SouthStar then demanded "payment in full immediately of all obligations, to include our total Factor Due amount of $514,592.97, in addition to all outstanding and pending legal fees."  Id.

In response to the Third Notice of Breach, Courcelle sent an email to SouthStar's Chief Operating Officer, Susan Linney ("Linney"), on September 25, 2023.  ECF No. 31-6 at 2.  In this email, Courcelle noted his understanding that the total factor due was $209,992.81.  Id.  However, at that point, SouthStar had $132,215.65 in escrow and unfactored receipts.[5]  ECF No. 31-6 at 2.  He therefore requested that "the escrow balance and unfactored receipts [be applied] against the open invoices," and he calculated that this would leave a factor due of $77,777.16.  Id.  He asked SouthStar to confirm his understanding with a payoff letter, which would indicate the total amount plaintiffs would need to pay to discharge their debt to SouthStar.  See id.

Despite Courcelle's request, Linney replied with the assertion that SouthStar would be unable to provide a payoff letter because plaintiffs' account was "in legal."  Id.  Courcelle's counsel, Michael Dodson ("Dodson"), then followed up through a series of

---

[5] Courcelle explained in his declaration that "[t]he 'Escrow' amount is an amount held by SouthStar to be distributed to one or more of Plaintiffs as payments from factored accounts.  'Unfactored Receipts' are amounts received by SouthStar but that are from accounts that have not been factored by SouthStar."  ECF No. 31-2 ¶ 13.

emails with SouthStar's counsel, Lindsey Cooper ("Cooper"). ECF No. 31-7 at 1–4.
Dodson reiterated plaintiffs' request for an updated payoff letter. Id.

Cooper, in reply, noted that legal fees were continuing to climb due to SouthStar's
having to defend this lawsuit. Id. SouthStar's position was that the Factoring
Agreement's reserve account provisions had been triggered by this point, and it was
therefore SouthStar's right to withhold its legal expenses associated with defending this
lawsuit in the reserve account.[6]  See ECF Nos. 31-4 at 2; 31-7 at 1–3; 51; 52; see also
ECF No. 31-5 ¶¶ 4–5, 10(b). Accordingly, so long as the lawsuit continues, SouthStar's
legal fees continue to accrue and so does the total amount of money owed by the FCA
Companies to SouthStar. See ECF Nos. 31-7 at 1–4; 31-4 at 2; 51; 52. In one of these
emails, Cooper explained that SouthStar would be willing to extinguish plaintiffs' debt
for $102,994.62. ECF No. 31-7 at 2. This figure included $20,000 in legal fees
SouthStar had already expended by that point, and the offer was contingent on those legal
fees not going up any further—in other words, the offer was contingent on plaintiffs
dropping this lawsuit. Id.

Plaintiffs rejected this offer and instead requested a payoff letter that would
indicate the amount they would need to pay to extinguish their debt and continue the suit.
See id. at 1. However, testimony from Courcelle indicated that plaintiffs never received
such a letter. See ECF No. 51.

---

[6] SouthStar's position on the attorney's fees was not specifically articulated in this
email chain between Dodson and Cooper. See id. However, SouthStar subsequently
clarified its position during the hearing. ECF Nos. 51; 52. Remarks from SouthStar's
counsel, testimony from SouthStar's Vice President Scott Norris, and other
communications between the parties that were introduced as exhibits all indicated
SouthStar's understanding that plaintiffs were to be responsible for SouthStar's legal fees
arising from this dispute. See ECF Nos. 51; 52.

On November 16, 2023, plaintiffs forwarded a payment to SouthStar.  ECF No. 31-2 ¶ 17.  As of that day, SouthStar's online portal reflected that plaintiffs' "Account Balance" was $231,887.59.  Id. ¶ 16.  However, it also stated that there was $132,215.65 in escrow and $105,870.00 in unfactored receipts, meaning the total amount in SouthStar's possession was $238,085.65.  Id.  That same day, Courcelle became aware that SouthStar sent a NOA to Woodward Design+Build, LLC ("Woodward"), one of FCA Construction's customers.  Id. ¶ 19.  SouthStar believed it was entitled to contact Woodward, and other entities with whom the FCA Companies did business, as part of its efforts to remedy plaintiffs' purported breaches of the Agreements.  See ECF No. 31-10 at 1–2; see also ECF No. 45 at 14 (citing ECF No. 9-3 ¶¶ 2–3).

Courcelle testified that the FCA Companies did a lot of business with Woodward and that the "demands from SouthStar . . . detrimentally affect[ed] [Woodward's] opinion of, and relationship with," plaintiffs.  ECF Nos. 31-2 ¶ 19; 51.  According to Courcelle, the FCA Companies would have to cease operations if their relationship with Woodward were terminated.  ECF No. 51.  Courcelle maintained that similar efforts by SouthStar to continue to contact plaintiffs' other customers resulted in the termination of plaintiffs' business relationships with those customers, which hurt plaintiffs' reputation and ability to receive payments and continue with business.  ECF No. 31-2 ¶¶ 19–21.  He specifically testified that some of his customers have withheld payments from him due to their receiving NOAs from SouthStar.  ECF No. 51.

Dodson emailed SouthStar's counsel on November 16 to address plaintiffs' concerns.  ECF No. 31-8 at 2.  He reiterated plaintiffs' position that, because the total amount in escrow and unfactored receipts exceeded the total amount plaintiffs owed

10

SouthStar and because plaintiffs had requested the escrow and unfactored receipts be applied against their debt, plaintiffs' debt should be extinguished.  Id.  He thus requested confirmation that plaintiffs' balance was zeroed out and that the NOAs that SouthStar sent to plaintiffs' customers would be rescinded.  Id.  According to Courcelle, SouthStar did not rescind many of the NOAs it sent to his customers,[7] and those customers have continued to withhold money they owe to the FCA Companies.  ECF No. 51.

Additionally, SouthStar did not confirm the FCA Companies' debt was paid off, nor did SouthStar provide plaintiffs with an updated payoff letter.  See id.; ECF No. 51. During the hearing, SouthStar produced a letter dated January 8, 2024, which apparently was never sent to Courcelle.  ECF No. 51. This letter, which was signed by SouthStar's Vice President, Scott Norris, reiterated SouthStar's position that it was "impossible to calculate the total and final legal expense balances" while this lawsuit is still pending, and as a result, SouthStar would be "unable to provide a finalized payoff amount until this litigation is settled."  Id.  In the letter, Norris went on to calculate plaintiffs' total debt as of November 16, 2023.  Id.  He did so by adding the factor due, legal expenses as of November 16, a misdirected payment charge, a minimum fee, an early termination fee, and a default services charge and subtracting the money in escrow and unfactored receipts.[8]  Id.  In total, SouthStar averred that plaintiffs owed Southstar $233,268.35 as of November 16, 2023.  Id.

---

[7] Courcelle testified that the NOAs sent to several customers, including Woodward, were never rescinded.  ECF No. 52.  Later in his testimony, he discussed a NOA that SouthStar sent another customer, Lemoine Disaster Recovery ("Lemoine"), around May 2, 2023.  Id.  He noted that the Lemoine NOA was rescinded about two weeks later but not until after Lemoine terminated its business with the FCA Companies. Id.

[8] Plaintiffs dispute the legitimacy of several of these fees.  See ECF No. 52.

### B. Transfer to this Court and Remaining Procedural History

On November 30, 2023, the District Court for the Eastern District of Louisiana transferred the case to this court because of the Factoring Agreement's forum selection clause.[9] ECF No. 27. Plaintiffs filed their TRO motion in this court on December 11, 2023, ECF No. 31, and SouthStar filed its motion to dismiss on the same day, ECF No. 33. SouthStar answered plaintiffs' amended complaint on December 13, 2023. ECF No. 35, Answer. In so doing, SouthStar asserts three counterclaims against plaintiffs: (1) breach of contract, (2) claim and delivery, and (3) foreclosure. See id.

On December 27, 2023, plaintiffs responded to SouthStar's motion to dismiss and SouthStar responded to plaintiffs' TRO motion. ECF Nos. 43; 45. Both sides then filed their respective replies on January 3, 2024. ECF Nos. 46; 47. After that, the court requested additional briefing on how the two pending motions should be decided if the court were to determine that Louisiana law governs the case, and both sides filed that supplemental briefing on January 9, 2024. See ECF Nos. 49; 50. Beginning on January 11, 2024, the court held a hearing on the two pending motions. ECF Nos. 51; 52. During that hearing, the court heard testimony from witnesses and reviewed evidence presented by the parties on the TRO motion. Id. As such, the matter is fully briefed and now ripe for the court's review.

## II. STANDARD

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions. "The purpose of a preliminary injunction

---

[9] The Factoring Agreement's Forum Selection Clause elects that "any dispute whatsoever . . . between the Parties in relationship to or in any way in connection with" the Factoring Agreement be brought in Charleston, South Carolina. ECF No. 31-5 ¶ 16.

is merely to preserve the relative positions of the parties until a trial on the merits can be held." United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)), modified in part, 906 F. Supp. 2d 463 (D.S.C. 2012), aff'd, 720 F.3d 518 (4th Cir. 2013).  A party seeking a preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest.  Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).  "To obtain a preliminary injunction under the Winter test, a movant must make a 'clear showing' of [the] four requirements." Alkebulanyahh v. Nettles, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011), aff'd, 454 F. App'x 231 (4th Cir. 2011); see also Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus requires that a party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits." (internal quotation marks omitted)).  As the Supreme Court has noted, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22.

### III.  DISCUSSION

Plaintiffs are requesting a TRO and preliminary injunction to prevent SouthStar from "(1) contacting any of Plaintiffs' customers concerning amounts owed and/or payable to any one or more of Plaintiffs, and (2) accepting and/or depositing any amounts owed and/or payable to any one or more of Plaintiffs, such that those amounts are paid to Plaintiffs rather than SouthStar."  ECF No. 31 at 1.

Before assessing whether the preliminary injunction is warranted, the court must begin by briefly addressing two threshold issues raised by SouthStar.  First, SouthStar argues in its response that plaintiffs' TRO motion should be denied because plaintiffs have failed to plead a cause of action for preliminary injunction.  ECF No. 45 at 7.  In reply, plaintiffs argue that they are not required to plead a cause of action for preliminary injunction because such an issue is properly raised on motion and because plaintiffs seek appropriate equitable relief in their amended complaint.  ECF No. 46 at 4–6.  Because requests for preliminary injunctions may be raised by motion, the court finds that the plaintiffs' preliminary injunction request is properly before the court.  See, e.g., Thomas v. Andino, 613 F. Supp. 3d 926 (D.S.C. 2020).

Second, the court must address an issue raised during the hearing on whether the specific injunctive relief sought by plaintiffs is mandatory or prohibitory.  ECF No. 52.  The parties disagree.  Id.  SouthStar says that the injunction would prevent it from collecting its debt and would therefore alter the status quo between the parties.  Id.  Thus, it argues that the requested injunction is mandatory relief.  Id.  Plaintiffs counter that their requested relief is prohibitory because the injunction would preserve the status quo by not forcing the FCA Companies out of business and because preventing SouthStar from contacting the FCA Companies' customers is not an affirmative obligation.  Id.

"A preliminary injunction may be characterized as being either prohibitory or mandatory."  League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 235 (4th Cir. 2014).  Mandatory relief is "disfavored, and warranted only in the most extraordinary circumstances."  S.C. Progressive Network Educ. Fund v. Andino, 493 F. Supp. 3d 460, 466 (D.S.C. 2020) (quoting Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994)).

14

Courts determine which of these categories an injunction falls in by looking to whether the injunction would alter or preserve the status quo. See id. For these purposes, the status quo is "the last uncontested status between the parties which preceded the controversy." Id. (quoting League of Women Voters of N.C., 769 F.3d at 236). While "mandatory [temporary restraining orders and preliminary] injunctions alter the status quo [generally by requiring the non-movant to do something], prohibitory [ones] aim to maintain the status quo and prevent irreparable harm while a lawsuit remaining pending." Id. (alterations in original) (quoting League of Women Voters of N.C., 769 F.3d at 235–36). Even if a party is being required by the court to undertake an affirmative obligation to restore the status quo, such is still prohibitory. League of Women Voters of N.C., 769 F.3d at 236.

Here, the parties dispute whether the Factoring Agreement's default provisions were ever triggered, such that SouthStar would have a right to build a reserve account and contact plaintiffs' customers for the purpose of recovering its collateral. ECF Nos. 45 at 15–16; 46 at 3–4; 52. Thus, the last uncontested status between the parties was that the Factoring Agreement was not terminated and that the default provisions have not been triggered. See id. An injunction preventing SouthStar from taking steps to recover its collateral would affirm, not alter, the status quo and would therefore be prohibitory. See S.C. Progressive Network Educ. Fund, 493 F. Supp. 3d at 466. In any event, the issue is ultimately irrelevant because the court finds that plaintiffs' TRO motion should be denied under either standard.

These preliminary issues out of the way, the court will now analyze the propriety of this TRO motion by looking to whether plaintiffs have met their burden of

15

demonstrating the four <u>Winter</u> factors.  555 U.S. at 20.  The court will take each of these factors in turn.

### A.  Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on the merits for three reasons. First, they argue that there was no obligation to perform.  ECF No. 52.  They point specifically to the statement in SouthStar's Third Notice of Breach that "SouthStar has no intention of continuing to fund under [the] Factoring . . . Agreement."  ECF No. 31-4 at 2.  Plaintiffs say that this was an anticipatory breach by SouthStar that terminated the Agreements between the parties.  ECF Nos. 46 at 3; 52.  In further support of this conclusion, plaintiffs note that Paragraph 10(b) of the Factoring Agreement requires termination of the Factoring Agreement before acceleration of the debt.  ECF No. 52; <u>see also</u> ECF No. 31-5 ¶ 10(b).  Because SouthStar called for acceleration of the debt in the Third Notice of Breach, the Factoring Agreement must have been terminated according to plaintiffs' reading of this Paragraph.  ECF No. 52.

Second, plaintiffs say that, even if the Agreements have not been terminated, there is no longer a default that permits SouthStar to exercise its undue control over plaintiffs' finances.  <u>Id.</u>  They argue that they paid off the $514,592.97 requested in the Third Notice of Breach when they requested that the money in escrow and unfactored receipts be applied toward that debt.  <u>Id.</u>  Specifically, plaintiffs say that, as of November 16, 2023, SouthStar claimed a "Factor Due" of $237,001.52 but had in its possession $132,215.65 in escrow and $105,870.00 in unfactored receipts, which together total $238,085.65.  ECF No. 31-1 at 10.  Plaintiffs point to the instructions Courcelle gave SouthStar in September 2023 (which plaintiffs' counsel reiterated in November 2023)

16

that directed SouthStar to apply the escrow and unfactored receipt amounts against the "Factor Due" amount.  Id.  Plaintiffs posit that, by giving these instructions, they paid off their debt and thereby cured the default mentioned in the Third Notice of Breach.  Id. at 10–11.  Therefore, plaintiffs say that their debt is paid off, and SouthStar is not permitted to take action to recover the collateral.  ECF Nos. 31-1 at 11–12; 52.

Third, plaintiffs say that SouthStar's actions amounted to bad faith and therefore entitle plaintiffs to receive the money owed to them—meaning that SouthStar cannot take possession of the money owed by Account Debtors as collateral.  ECF No. 52.  Plaintiffs point to their repeated requests for a payoff letter, which SouthStar did not oblige.  Id.  They note that SouthStar continues to hold their money in reserve during the pendency of this lawsuit to cover litigation expenses and that, as a result, SouthStar cannot tell plaintiffs how much plaintiffs will eventually have to pay.  Id.  They also point to the fact that the Third Notice of Breach mentions that there could be additional defaults.  Id.  However, plaintiffs say they have been unable to cure these other defaults because SouthStar has been unable to identify them.  Id.  Overall, plaintiffs emphasize that SouthStar has been evasive and unclear on how plaintiffs can cure the purported defaults and pay off their debt, which plaintiffs aver amounts to bad faith.  Id.

In response, SouthStar asserts three points of its own to argue that plaintiffs have not met their burden of showing they are likely to succeed on the merits.  First, SouthStar argues that plaintiffs breached the Factoring Agreement in several ways.  Id.  It points to the fact that plaintiffs took on the MCA debt,[10] failed to pay contractors and suppliers,

_____

[10] There seems to have been some confusion between the parties as to whether SouthStar is specifically pointing to the MCA debt that plaintiffs had taken on before entering into the Agreements or the Parkside MCA debt, which plaintiffs acquired after

and misdirected and accepted funds from Account Debtors whose accounts had already been sold to SouthStar. ECF Nos. 45 at 15 (citing ECF No. 31-4); 52. Because SouthStar considers plaintiffs to have breached the Factoring Agreement, SouthStar argues that its efforts to contact plaintiffs' customers and assert control over plaintiffs' accounts were permissible efforts by SouthStar to assert control over its collateral. ECF Nos. 45 at 15–16; 52.

Second, as to plaintiffs' fraud-based claims, SouthStar argues that the evidence shows that there was no misrepresentation by Culbreth because the Agreements expressly permitted SouthStar to contact plaintiffs' customers and that plaintiffs were aware of this. ECF No. 45 at 14. SouthStar conceded that there may have been a misunderstanding between Courcelle and Culbreth over the level of verification that SouthStar would send to plaintiffs' customers, but it says that Courcelle clearly knew some sort of verification would be sent. ECF No. 52.

Third, SouthStar says that plaintiffs' other claims fail because plaintiffs have not shown that SouthStar owed plaintiffs a duty and because these claims are barred by the economic loss rule. ECF Nos. 45 at 10–12; 52. It specifically points to the lack of evidence that it ever undertook a special relationship with plaintiffs and emphasizes that it therefore owed plaintiffs no duty.[11] ECF Nos. 45 at 10–12; 52.

---

entering into the Agreements. See ECF Nos. 45 at 15; 46 at 9. Plaintiffs argue that they did not default on the Factoring Agreement in either case. ECF No. 46 at 9. The court interprets Southstar's argument as a reference to the Parkside MCA debt based on both testimony and evidence offered during the hearing. See ECF Nos. 51; 52.

[11] Plaintiffs retort that SouthStar's arguments on the merits of plaintiffs' claims are irrelevant to the court's determination on the preliminary injunction. ECF No. 52. They say, instead, that the only points relevant to this determination are the issues surrounding the preliminary injunction itself. Id. According to plaintiffs, because the preliminary injunction concerns SouthStar's efforts to recover its collateral, the court

The record in this case is unclear on which party will ultimately prevail on the merits. In particular, the evidence is conflicting as to whether the Factoring Agreement was terminated and as to whether plaintiffs satisfied their obligations under the Agreements. Plaintiffs are correct that SouthStar's Third Notice of Breach could plausibly be read as a termination of the Factoring Agreement. See ECF No. 31-4. This is especially true when read in conjunction with the Factoring Agreement's Paragraph 10(b), which could plausibly be read to require that the Factoring Agreement be terminated before SouthStar is able to accelerate the loan. See ECF No. 31-5 ¶ 10(b). However, Paragraph 10(b) also states that it only applies when the Factoring Agreement is terminated by SouthStar, "in its sole discretion," id., and SouthStar denies that it terminated the Factoring Agreement, see ECF No. 51. Thus, plaintiffs have failed to make a "clear showing" that the Factoring Agreement was terminated. See Alkebulanyahh, 2011 WL 2728453, at *3.

It is also unclear whether plaintiffs' debt to SouthStar should have been extinguished based on plaintiffs' repeated requests that escrow and unfactored receipts be applied against the factor due. During the hearing, Norris acknowledged that the escrow

---

should focus on plaintiffs' likelihood of success on the merits with regard to those issues—in other words, the court should focus on whether there is a continuing contractual relationship between the parties, whether plaintiffs extinguished their contractual obligation to SouthStar, and whether SouthStar acted in bad faith. See id. Nevertheless, plaintiffs also assert that their fraud-based claims are likely to succeed because these claims were not based on the allegation that SouthStar would never contact their customers. Id. Rather, they say these allegations are based on the alleged representation that Courcelle would have the opportunity to direct and control the interaction between SouthStar and plaintiffs' customers. Id. They say SouthStar reneged on these representations when it interacted with plaintiffs' customers after plaintiffs purportedly told SouthStar not to do so because its contacting these customers would harm plaintiffs' business. Id.

and unfactored receipts exceeded the amount plaintiffs owed as of November 16, 2023, but he also explained that nothing in the Factoring Agreement required SouthStar to apply these amounts toward plaintiffs' debt.  Id.  Yet testimony from another of SouthStar's witnesses indicated that unfactored receipts had previously been used to offset money owed to SouthStar through chargebacks on old accounts.  ECF No. 51. Thus, while plaintiffs reasonably wanted the escrow and unfactored receipts to be applied toward their outstanding balance, it is unclear whether SouthStar was under a contractual obligation to indulge this request.[12]  See ECF No. 51.

For these reasons, the court finds that the record is unclear on which party is more likely to succeed on the merits.  Without a clear showing one way or the other, plaintiffs have not carried their burden on this element, and the preliminary injunction must be denied accordingly.  See Alkebulanyahh, 2011 WL 2728453, at *3; see also Winter, 555 U.S. at 20, 22.  Yet for the sake of completeness, the court will proceed to briefly consider the remaining three elements.

**B. Likelihood of Irreparable Harm**

Plaintiffs argue that SouthStar's contact with their customers has resulted in a lost business relationship with at least one customer, and that another customer, Woodward,

---

[12] Even if SouthStar were under an obligation to apply escrow and unfactored receipts toward plaintiffs' debt, the January 8, 2024 letter suggests that doing so would have been insufficient to cover the total amount owed to SouthStar.  Id.  The court acknowledges that plaintiffs dispute the legitimacy of the fees listed in this letter.  Id.  It also acknowledges plaintiffs' concerns regarding SouthStar's position that it can continue to accumulate legal fees during the pendency of this litigation even if it has not yet prevailed in the case.  Id.  However, as plaintiffs conceded during the hearing, the Factoring Agreement's attorneys' fee provision is worded very broadly.  Id.  Plaintiffs have not made a clear showing that the fees listed in this letter are illegitimate, and therefore, they have not sufficiently shown likelihood of success for the purposes of their TRO motion.  See Alkebulanyahh, 2011 WL 2728453, at *3.

has begun withholding payment from plaintiffs because of SouthStar's contact.  ECF No. 31-1 at 13.  These concerns were supported in both Courcelle's declaration and in his hearing testimony.  ECF Nos. 31-2 ¶¶ 20–21; 51.  Courcelle says that the FCA Companies will go out of business if they do not receive payments soon.  ECF No. 31-2 ¶¶ 20–21; 51.  Beyond that, Courcelle also testified that he has been in contact with an attorney about the possibility of filing for bankruptcy, and he explained that filing for bankruptcy can be particularly detrimental to construction-related businesses.  ECF No. 51.  Thus, plaintiffs say the preliminary injunction is necessary for them to take back control of their finances, to prevent their further reputational harm, and to avert the permanent loss of their business.  ECF No. 31-1 at 13–14.

In response, SouthStar argues that the types of harms described by plaintiffs are not irreparable because they could eventually be compensated for through monetary damages.  ECF No. 45 at 16–17.  However, even if that were not the case, SouthStar says that plaintiffs have not adequately shown that they would suffer permanent reputational harm or loss of business if the preliminary injunction is not granted.  Id.

"The permanent loss of a business, with its corresponding goodwill, is a well-recognized form of irreparable injury."  Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 719 (4th Cir. 2021).  Such is not the case when the loss can be compensated for through money damages.  Id.

Here, plaintiffs have amply shown that they could face an immediate destruction of their ability to do business and an ongoing, permanent breakdown in their relationships with several of their customers due to SouthStar's actions.  See ECF Nos. 31-2 ¶¶ 8–10, 18–22; 51.  Specifically, they have pointed to the evidence showing they specifically

requested that SouthStar not send NOAs to certain customers, but that SouthStar did so anyway.  See ECF Nos. 31-2 ¶¶ 9–10; 19–20; 51; 52.  They have shown that this, in turn, harmed their reputation and relationship with these customers, which resulted in lost profit.  See ECF Nos. 31-2 ¶¶ 9–10; 19–20; 51; 52.  These types of losses are the types of "incalculable" losses courts often consider as irreparable harm.  See Northgate Assocs., LLLP v. N.Y. Credit Funding I, LLC, 2008 WL 3200630, *6 (M.D.N.C. Aug. 5, 2008) (listing cases) (quoting Blackwelder Furniture Co. of Statesville v. Selig Mfg. Co., 550 F.2d 189, 197 (4th Cir. 1977)).  Consequently, this element supports granting the preliminary injunction.  See id.

## C. Balance of Hardships

Plaintiffs argue that the balance of hardships weigh in their favor.  ECF No. 46 at 11–13.  They say that they paid off the debt claimed by SouthStar despite their cash flow shortages and that, now that they have done so, they should be allowed to take back control of their business.  ECF No. 31-1 at 14.  In contrast, SouthStar argues that it faces the balance of the hardships because plaintiffs breached the Factoring Agreement and because plaintiffs were offered the chance to exit their contractual obligations but declined do so.[13]  ECF No. 45 at 18–19.

Plaintiffs have sufficiently shown that they will suffer the balance of the hardships in this case.  For reasons previously explained, it is unclear whether or not plaintiffs breached the Factoring Agreement.  See ECF No. 51.  However, even if they did, plaintiffs have sufficiently shown that they face the possibility of permanent irreparable

---

[13] This appears to be a reference to SouthStar's offer to allow plaintiffs to extinguish their debt by paying SouthStar $102,994.62 and dropping this lawsuit.  See ECF No. 45 at 19 (citing ECF No. 31-7 at 2).

damage to their business.  See ECF Nos. 31-2 ¶¶ 20–22; 52; see also SAS Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 387–88 (4th Cir. 2017) (explaining that courts must consider the balance of hardships between a plaintiff and defendant "even in cases involving clear wrongdoing").  This would be detrimental to plaintiffs and outweighs SouthStar's need to recover its collateral, especially when there is an open question as to whether plaintiffs have already paid off their debt to SouthStar.  See ECF Nos. 31-2 ¶¶ 20–22; 51; 52.  As such, the balance of the hardships weighs in favor of granting the preliminary injunction.  See SAS Inst., 874 F.3d at 387–88.

### D.  The Public Interest

Plaintiffs argue that the public interest, if implicated at all, favors granting the preliminary injunction because, once a debtor's obligations have been satisfied, his obligations should be considered extinguished and his creditor should not then be permitted to overreach by exerting undue control over collateral.  ECF No. 31-1 at 16.  SouthStar, in response, says that it is simply exercising its contractual rights under the Factoring Agreement and that the public interest favors allowing a party to exercise its contractual rights.  ECF No. 45 at 19–20.

As a general rule, it is in the public interest for courts to enforce contractual agreements that are knowingly and voluntarily entered into.  See Carlson Env't Consultants, PC v. Slayton, 2017 WL 4225993, at *11 (W.D.N.C. Sept. 21, 2017).  The plaintiffs in this case are sophisticated parties.  See ECF No. 51.[14]  While they may claim the Factoring Agreement is invalidated by fraud or error, the evidence of fraud or error is

---

[14] During the hearing, it was brought out that Courcelle, in addition to his background operating the FCA Companies, is also a licensed CPA.  Id.

23

conflicting, and plaintiffs have failed to make a clear showing that the Factoring Agreement is invalid.[15]  See id.  Moreover, plaintiffs have also not made a clear showing that they extinguished their obligations under the Factoring Agreement.  See id.  The terms of the Agreements are very broad and arguably permit SouthStar to recover their collateral in the manner they have undertaken.  See ECF No. 31-5 ¶¶ 5–6, 8, 10. Consequently, plaintiffs have failed to make a clear showing that the injunction they request is in the public interest.  See Alkebulanyahh, 2011 WL 2728453, at *3; Carlson Env't Consultants, 2017 WL 4225993, at *11.

In sum, while the plaintiffs have sufficiently demonstrated irreparable harm and that the balance of hardships tips in their favor, they have failed to make a clear showing that they are likely to succeed on the merits or that the public interest favors granting the preliminary injunction.  See Alkebulanyahh, 2011 WL 2728453, at *3; see also Winter, 555 U.S. at 20, 22.  As such, the court denies plaintiffs' TRO motion.[16]

---

[15] Specifically, the testimony and exhibits offered during the hearing were conflicting as to what Culbreth's pre-contractual representations were and as to whether those representations reflected the language of the Agreements.  See id.

[16] Because the court denies plaintiffs' TRO motion, it dispenses with consideration of the parties' arguments over the appropriate bond amount.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiffs' motion for a

temporary restraining order and preliminary injunctive relief.

      **AND IT IS SO ORDERED.**

 

_____

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 29, 2024**
**Charleston, South Carolina**